Filed 7/30/21  In re Ashley R. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re ASHLEY R. et al., Persons Coming Under Juvenile Court Law. | B306895 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 20CCJP01359A-B) |
| Plaintiff and Respondent, | |
| v. | |
| L.I., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Jean M. Nelson, Judge.  Affirmed.

Roni Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

_____

## INTRODUCTION

In the proceedings below, the court sustained three counts of a petition filed by the Los Angeles County Department of Children and Family Services (DCFS) under Welfare and Institutions Code section 300, subdivisions (a) and (b)(1) (Sections 300(a) and 300(b)(1)), and found jurisdiction over appellant-mother L.I.'s two children, Ashley R. (born October 2015) and Y.R. (born March 2017).[1] Two of the counts (a-1 and b-1) identically alleged that domestic violence between Mother and non-party-father R.R. endangered the children, and the third count (b-2) alleged that Father's substance abuse endangered the children. After finding jurisdiction, the court removed the children from both parents and ordered Mother to participate in various services.

On appeal, Mother argues the court erred in: (a) finding sufficient evidence to take jurisdiction under

_____

[1]    Undesignated references are to the Welfare and Institutions Code.

2

Sections 300(a) and 300(b)(1); (b) removing the children based on an allegedly erroneous jurisdictional finding instead of ordering "[v]oluntary supervision of the family under section 301"; and (c) ordering Mother to participate in services without evidence she would not participate voluntarily. We conclude: (a) sufficient evidence supports jurisdiction under Section 300(b)(1), obviating the need to analyze whether the court properly assumed jurisdiction under Section 300(a); (b) the court could not order voluntary supervision under section 301 at the disposition hearing and to the extent Mother intended to argue the court should have ordered voluntary supervision under section 360, subdivision (b), the court did not abuse its discretion in not doing so; and (c) the court did not abuse its discretion in ordering Mother to participate in the case plan. We therefore affirm.

### STATEMENT OF RELEVANT FACTS

### A. *DCFS Receives a Referral and Mother Obtains a Restraining Order*

In January 2020, DCFS received a referral stating that Mother had reported a domestic violence incident to the police. Three days earlier, Father had allegedly encountered Mother at the home of a friend, grabbed her neck, and then left with their four-year-old daughter Ashley. Mother had also reported a history of prior domestic violence incidents. Father was refusing to let Mother see Ashley, and Mother was advised to obtain a restraining order.

3

Five days after the incident, Mother applied for a temporary restraining order. Attached to her application was a signed declaration, attesting to a history of violence at Father's hands. Mother declared that Father "initially became violent during [her] first pregnancy . . . ." Whenever Father would "drink heavily[,] he would come home and hit [Mother], punching and slapping [her] with his hands." On some occasions, Father beat her with charging cables. The beatings happened as frequently as once a week, and her children had witnessed the violence "all their lives." Mother claimed Ashley was afraid of Father and that their two-year-old son, Y.R., had been copying Father and striking both Ashley and other children. Mother also described two recent incidents: In November 2019, Father returned home drunk and with another woman. Both Father and the woman demanded Mother take the children and leave the house, claiming the new woman was Father's "wife" now.[2] Mother "splashed water" at the woman, and she grabbed Mother's hair. Father then punched Mother in her neck, causing pain that lasted several days. The noise awakened Ashley, and Father and the woman released Mother. Because Mother feared they would continue the violence if she stayed, she took the children and left.

Mother claimed she did not see Father again until January 10, 2020, when she learned from her babysitter that Father was coming to take the children. Mother hurried to

---

[2]    Mother and Father were not married.

4

retrieve the children from the babysitter's home, but Father arrived as they were leaving. Father approached Mother, who was carrying Y.R. and holding Ashley's hand, grabbed Mother by the neck with one hand, and took Ashley with the other hand and left. Mother went to the police station the next day and was advised to apply for a restraining order. Mother concluded that she needed a restraining order "because I am afraid for my daughter's safety, I am afraid that [Father] will continue his violence against me, and I want to protect my children from witnessing any more violent behavior by [Father]." Mother also attested that she did not give notice of the application for a TRO to Father because she "was afraid that the violence and/or harassment would reoccur/occur" if she gave notice. The court granted the TRO.

### B. *DCFS Investigates*

Four days after receiving the referral, a children's social worker (CSW) interviewed Mother in Spanish, as she indicated this was her primary language. Mother confirmed the incident described in the referral, as well as obtaining a TRO. She also "reported [a] history of multiple prior domestic violence incidents with father," stating he would become aggressive toward her while under the influence of alcohol, and had repeatedly assaulted her while she was pregnant with Ashley. She additionally reported an incident in which she and Father's girlfriend had a physical

5

altercation while the children were present. Mother denied using drugs or alcohol.

One month later, a CSW interviewed Father, who was living with the paternal grandmother (PGM). Father admitted he and Mother verbally argued, but denied their disputes ever became physical. When asked about Mother's statement that she fought with Father's girlfriend, Father explained that PGM had allowed one of her friends to stay in the house, and Mother became upset and physically fought with the woman in front of the children. When asked if he had hit Mother during that altercation, Father stated he was so drunk that night he might have, but did not recall. Father denied having a problem with alcohol abuse, but admitted to getting drunk on the weekends. Father then stated people told him that Mother drank excessively. When asked when he last saw the children, he said he had seen them the previous day in court for the restraining order hearing, but otherwise had not seen them since October or November.

When PGM was asked when Mother and the children had been in the home last, she answered they had eaten dinner with Father and her the previous day. PGM stated that Mother had been in and out of the home several times since the restraining order had been issued, and Mother and the children had once spent the night.

The CSW then spoke with both Father and PGM, and after persistent questioning by the CSW, Father admitted both that he knew the restraining order required him to

have no contact with Mother and the children, and that Mother and the children had returned to the home the previous day, and they had eaten a meal together. When asked why he had violated the restraining order, Father stated that Mother had insisted on seeing him. He also said Mother would simply "show[] up at his home sometimes."

Another CSW spoke with Mother that same day (again speaking in Spanish), and Mother claimed that since Ashley was returned after service of the restraining order, she had seen Father only at court. The next day, the CSW confronted Mother with the information from Father and PGM regarding Mother visiting Father with the children. Mother continued to deny that she had seen Father other than at court.

On March 3, 2020, the court signed an order authorizing DCFS to remove the children from their parents' custody. DCFS detained the children the next day.

### C. *DCFS Files a Petition*

Two days later, DCFS filed a petition under Sections 300(a) and (b)(1). Counts a-1 and b-1 identically alleged that Mother and Father had a history of engaging in ongoing violent verbal and physical altercations in the children's presence, stating generally that Father struck Mother with his hands and with electrical cables on multiple occasions, and also referencing the two specific incidents Mother had reported in the TRO application. The counts additionally alleged that the January incident led to a protective order,

7

which Mother and Father both violated. Count b-2 alleged that Father was an abuser of alcohol, and had been under its influence while caring for the children; it also alleged Mother failed to protect the children from Father's alcohol abuse. Count b-3 alleged that Mother was an abuser of alcohol, and had been under its influence while caring for the children; it also alleged Father failed to protect the children from Mother's alcohol abuse.

The court held its initial detention hearing the next court day. Both Spanish and K'iche' interpreters were on hand to help Mother and Father.[3] Mother submitted a notarized affidavit to the court, apologizing for demonstrating "non-willful negligence towards the laws of this state," but still claiming she had never returned to the family home after leaving it in October 2019. Both Mother and Father requested the court release the children to Mother. Father's counsel acknowledged the evidence that Mother violated the TRO by visiting Father, but wondered whether Mother had received "all of the information she needed," due to the language barrier. Counsel for DCFS pointed out that if Mother simply had not understood the TRO, "there would [have] be[en] no reason for her to be dishonest with the social worker when she was confronted." The court agreed that Mother's statements indicated deception rather than misunderstanding, and ordered the children detained from both parents. Subsequently, the

---

[3] The K'iche' interpreter was present for Mother.

court ordered that Mother was to be interviewed with a K'iche' interpreter. At Mother's request, the court also ordered DCFS not to interview her about domestic violence allegations. At some point, DCFS filed a last minute information disclosing concerns regarding PGM's "protective capacity" because PGM had told Mother not to disclose domestic violence incidents when interviewed by the CSWs.

### D. *DCFS Continues to Investigate*

In further interviews, Mother confirmed that Father drank, but stated he had alcohol only every 15 to 20 days. Mother did not know how much he drank, because Father would stay in the car when he was drinking to prevent the children from seeing him intoxicated. Mother denied Father ever cared for the children when intoxicated. She also denied any alcohol use herself. Mother agreed to test for drugs and alcohol and tested negative on March 26, May 4, and June 3, 2020, but was a "[n]o [s]how" to tests scheduled for April 21 and May 18, 2020.

Father again confirmed he had verbal altercations with Mother while the children were present, but denied any physical altercations. Father confirmed his previous statement that he had violated the TRO by having contact with Mother and the children, but claimed this had occurred only once; although Mother visited his home multiple times, he claimed to have been there on only one occasion when she came. Father admitted he would become "significantly intoxicated" once or twice a month, but would sleep in his car

9

or stay with others so the children would not see him intoxicated. Father agreed to test for alcohol and drugs and tested negative on April 7 and May 29, 2020, but was a "[n]o [s]how" on April 10, April 30, and May 15, 2020.

DCFS also spoke with the children's foster mother, who expressed concern about Ashley's mental and emotional state, because "Ashley will make random statements about father striking mother without anybody asking her," but could not elaborate on her statements. Ashley mentioned one incident in which "mother had blood on her hands and there was mention of a knife," but the foster mother could not understand Ashley any further.

In April 2020, Mother and Father stipulated to dismiss the TRO.[4] The TRO was dismissed on May 12, 2020.

In early May 2020, Mother and Father received referrals for services from DCFS. However, neither had enrolled in any services by late June 2020, due to the COVID-19 pandemic.

### E. *Adjudication and Disposition*

No witnesses testified at the adjudication and disposition hearings. The children's counsel asked the court to sustain counts a-1 and b-1 (alleging Mother and Father's domestic violence endangered the children) and b-2 (alleging Father's alcohol abuse (and Mother's failure to protect the

---

[4] The TRO had originally been scheduled to lapse on March 16, 2020, and Mother had indicated she would no longer be pursuing it, but the hearing date was continued several times.

10

children from that abuse) endangered the children), but dismiss count b-3 (regarding Mother's alleged alcohol abuse). Mother's counsel requested the court dismiss counts a-1 and b-1 because there was no evidence the children were ever harmed or placed in harm's way during the domestic violence incidents, dismiss Mother from count b-2 because there was no evidence she failed to protect the children from Father's alcohol abuse, and dismiss count b-3 for lack of evidence. Father's counsel requested the court dismiss the petition in its entirety, arguing insufficient evidence, and lack of a nexus between the petition's allegations and harm to the children. DCFS's counsel stated it had nothing to add beyond what was in the reports submitted to the court. The court dismissed count b-3 for lack of evidence, sustained counts a-1 and b-1, and sustained count b-2 after striking the allegations regarding Mother. The court found both children to be dependents of the court.

Counsel for the children argued they should remain in foster care, but asked the court to order DCFS to assess Mother for overnight visits. Mother's counsel asked that the children be returned to her care. Father's counsel asked that the children be released, without specifying to whom. DCFS's counsel made no request. The court ordered the children removed from both parents due to a "long history of domestic violence with the parents and a failure to abide by the restraining order by both parents." Recognizing the difficulty of enrolling in programs due to the pandemic, the court nevertheless found that "the risk of further domestic

11

violence remains until they address these issues . . . ."  The court ordered Mother to attend a support group for domestic violence, to participate in conjoint counseling with Father if the two were reconciling, and to undergo individual counseling regarding the case issues.  The court also ordered Mother to test for substances upon reasonable suspicion of substance abuse.  Mother timely appealed.

## DISCUSSION

"On appeal, the 'substantial evidence' test is the appropriate standard of review for both the jurisdictional and dispositional findings."  (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.)  Under a substantial evidence review, "'we view the record in the light most favorable to the juvenile court's determinations, drawing all reasonable inferences from the evidence to support the juvenile court's findings and orders.  Issues of fact and credibility are the province of the juvenile court and we neither reweigh the evidence nor exercise our independent judgment.'"  (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560.)  "Evidence from a single witness, even a party, can be sufficient to support the trial court's findings."  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

## A. *The Court Did Not Err in Finding Jurisdiction*

"When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence." (*In re Alexis E.*, *supra*, 171 Cal.App.4th at 451.) Because we conclude substantial evidence supports the court's jurisdictional finding under Section 300(b)(1), we do not consider the propriety of the jurisdictional finding under Section 300(a).

"Exposing children to recurring domestic violence may be sufficient to establish jurisdiction under section 300, subdivision (b)." (*In re T.V.* (2013) 217 Cal.App.4th 126, 134; see also *In re Heather A.* (1996) 52 Cal.App.4th 183, 193-194 [jurisdiction under Section 300(b)(1) supported by substantial evidence of ongoing domestic violence, where one incident occurred in front of the children]; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717 [physical violence between a child's parents may support jurisdiction under Section 300(b)(1) "if there is evidence that the violence is ongoing or likely to continue and that it . . . placed the child at risk of physical harm"].)

13

Here, substantial evidence supported the finding of ongoing domestic violence that placed the children at substantial risk of serious physical harm. In January 2020, Mother submitted a declaration along with her application for TRO, in which she averred that Father initially became violent during her first pregnancy and, on a weekly basis when drunk, would punch and slap her with his hands, or beat her with charging cables. Mother attested that the children had witnessed this violence "all their lives." Mother also related two recent incidents: one in November 2019 in which Father punched her in the neck, inflicting lasting pain, and one in January 2020 when Father grabbed her by the neck while she was holding her four-year-old daughter by the hand and her two-year-old son in her arms. Apart from the declaration, Mother made similar statements directly to CSWs. She confirmed the incident in which Father grabbed her by the neck, and also "reported [a] history of multiple prior domestic violence incidents with father," stating he would become aggressive toward her while under the influence of alcohol, and had repeatedly assaulted her while she was pregnant with Ashley. Ashley's foster mother reported that Ashley would "make random statements about father striking mother without anybody asking her," and once related an incident in which "mother had blood on her hands and there was mention of a knife." This constitutes substantial evidence of ongoing domestic violence in the presence of the children; Father's willingness to grab Mother by the neck while she was carrying Y.R. and

14

holding Ashley's hand is substantial evidence that the domestic violence placed the children at substantial risk of serious physical harm.

Mother argues the court erred in finding jurisdiction under Section 300(b)(1) because:  (a) the children suffered no physical abuse or substantial risk of physical abuse; (b) Father only grabbed Mother's neck without closing her airway; (c) the police did not arrest Father; (d) the minors were in Mother's care when Father drank; and (e) the declaration accompanying Mother's request for a TRO has no probative value because there is no evidence a K'iche' interpreter helped Mother with it.

We briefly dispose of Mother's first four contentions. First, "[t]he parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163.)  In other words, that the children had yet to suffer physical harm is not dispositive.  Father's regular infliction of physical abuse on Mother in the children's presence placed them at substantial risk of harm.

Second, no authority provides that jurisdiction cannot be assumed when one parent grabs the other by the neck without cutting off the latter's air supply.  Father's actions could easily have caused Mother to raise her arms reflexively in defense, dropping her infant son.

15

Third, that Father was not arrested does not negate domestic violence. No authority equates police inaction with the nonoccurrence of an event.

Fourth, Mother's point is unclear when she notes that the children were in her care when Father was drinking. To the extent she suggests the court could not find jurisdiction over the children based on an allegation that she failed to protect them from Father's alcohol abuse, the court did not -- it specifically struck that allegation from count b-2. To the extent she contends the court could not find jurisdiction under count b-2 because Father's alcohol abuse allegedly did not harm the children, Father has not appealed, and Mother lacks standing to pursue this claim. (Code Civ. Proc., § 902 ["Any party aggrieved may appeal in the cases prescribed in this title"]; *In re Nachelle S.* (1996) 41 Cal.App.4th 1557, 1560 [applying this section to dependency proceedings].) In any event, evidence that Father regularly assaulted Mother while drunk sufficed to find Father's alcohol abuse placed the children in danger.

Finally, we reject Mother's contention that we should disregard her TRO declaration because she lacked the help of a K'iche' interpreter when she signed it. First, that argument is forfeited because she failed to raise it below. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 221 ["A party forfeits the right to claim error as grounds for reversal on appeal when he or she fails to raise the objection in the trial court"]; *id.* at 222 ["Forfeiture . . . applies in juvenile dependency litigation and is intended to prevent a party

16

from standing by silently until the conclusion of the proceeding"].)[5]  Even were we to consider the argument, we would find it unpersuasive.  Mother points to nothing evidencing her ignorance of the contents of her declaration.  Moreover, she told DCFS her primary language was Spanish, and spoke to multiple CSWs in Spanish.  Finally, even were we to disregard Mother's declaration in its

---

[5]      In her reply brief, Mother argues "[i]ssues regarding intervention are not subject to the doctrine of waiver or forfeiture," citing *In re Brian P.* (2002) 99 Cal.App.4th 616 (*Brian P.*); *In re Chantal S.* (1996) 13 Cal.4th 196, 210 (*Chantal S.*); and *In re Tommy E.* (1992) 7 Cal.App.4th 1234 (*Tommy E.*).  None of these cases supports her argument.  *Brian P.* held that a party who fails to object on grounds of insufficient evidence does not forfeit a substantial evidence challenge on appeal.  (*Brian P.*, *supra,* at 623 ["'Generally, points not urged in the trial court cannot be raised on appeal.  [Citation.]  The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule'"].)  We do not hold Mother forfeited any argument that her declaration is insufficient to support jurisdiction; rather, we hold Mother forfeited the argument that the court should not have considered the declaration.  *Tommy E.* held that a parent did not forfeit the right to challenge a jurisdictional finding by submitting the matter on the social worker's report; that has no bearing on Mother's argument.  (*Tommy E.*, *supra*, at 1236-1239.)  And *Chantal S.* has nothing to do with forfeiture.  (*Chantal S.*, *supra*, at 200 [court considered whether "a juvenile court, when terminating its dependency jurisdiction, [may] issue an order conditioning visitation on a parent's participation in a counseling program" and if so, whether "the juvenile court [is] bound by the requirements of Family Code section 3190, which governs counseling orders issued by a family court"].)

17

entirety, the statements Mother made to DCFS as well as Ashley's unprompted references to domestic violence would still constitute substantial evidence of domestic violence, supporting the finding of jurisdiction over the children.

**B.** ***The Court Did Not Err in Removing the Children; Voluntary Supervision Under Section 301 Was Unavailable***

Mother argues that the court erred in removing the children from her because "the jurisdictional findings fail for lack of substance," and because "[v]oluntary supervision of the family under section 301 would have [been] less drastic" and sufficient. As discussed above, the jurisdictional findings do not fail for lack of substance.

Section 301, subdivision (a), provides: "In any case in which a social worker, after investigation of an application for petition or other investigation he or she is authorized to make, determines that a child is within the jurisdiction of the juvenile court or will probably soon be within that jurisdiction, the social worker may, in lieu of filing a petition or subsequent to dismissal of a petition already filed, and with consent of the child's parent or guardian, undertake a program of supervision of the child." By the disposition hearing, the section 300 petition had already been filed and had not been dismissed; accordingly, the voluntary program of supervision contemplated by section 301 was no longer available. Mother provides no authority to the contrary.

18

In its respondent's brief, DCFS suggests Mother may have intended to argue that the court should have proceeded under section 360, subdivision (b). (Welf. & Inst. Code, § 360, subd. (b) ["If the court finds that the child is a person described by Section 300, it may, without adjudicating the child a dependent child of the court, order that services be provided to keep the family together and place the child and the child's parent or guardian under the supervision of the social worker for a time period consistent with Section 301"].) "Whether to exercise this option under section 360, subdivision (b), is a discretionary call for the juvenile court to make; it may opt to do so, but it need not." (*In re N.M.* (2011) 197 Cal.App.4th 159, 171.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*Ibid.*)

Mother never asked the court to proceed under this section. "[I]f the law does not require the juvenile court to act in a certain way, the parent bears the responsibility to care for his or her own interests by asking the court to exercise its discretion in a manner favorable to the parent. In such circumstances, the courts have not permitted the silent parent to argue that the juvenile court erred in not being psychic." (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) Mother has therefore forfeited this argument.

Even were we to consider her argument, the evidence shows that Mother willfully disobeyed the TRO several times, and then attempted to deceive DCFS and the court

19

about her actions.  Further, neither parent had yet addressed the domestic violence issues that led to jurisdiction in the first place.  Given this history, even had Mother requested this course of action, we would find the court was well within the bounds of reason to decline to order informal supervision.

### C.  *The Court Did Not Err in Ordering Mother to Participate in Her Case Plan*

If a child is declared a dependent, "the juvenile court may direct any reasonable orders to the parents . . . of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . .  That order may include a direction to participate in a counseling or education program . . . .  The program in which a parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300."  (Welf. & Inst. Code, § 362, subd. (d).)  We will not reverse the court's order "'absent a clear abuse of discretion.'"  (*In re Briana V.* (2011) 236 Cal.App.4th 297, 311.)

Here, the court ordered Mother to attend a support group for domestic violence, to participate in conjoint counseling with Father if the two were reconciling, and to undergo individual counseling regarding case issues.  The court also ordered Mother to test for substances if there was a reasonable suspicion of substance abuse.  Mother argues

these orders were "unfounded and an unnecessary invasion of privacy . . . because there was no indication that the mother would not voluntarily participating [*sic*] in treatment." In other words, Mother does not question the propriety of the case plan, or the court's authority to make reasonable orders; she contends only that that the court abused its discretion in ordering her to enroll in services without evidence that she would refuse to do so voluntarily. Mother provides no authority requiring a court to find a parent recalcitrant before issuing an order under section 362, and we find the court's orders well within the bounds of reason.

## DISPOSITION

We affirm the court's jurisdictional and dispositional orders.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, P. J.

We concur:

WILLHITE, J.

CURREY, J.